**In re Barbara A. GARBER, Debtor.**

**Bankruptcy No. 87–00185.**

United States Bankruptcy Court, D. Rhode Island.

July 17, 1991.

See also 88 B.R. 15.

Z. Hershel Smith, DiSandro–Smith & Associates, P.C., Inc., Providence, R.I., for debtor.

Matthew J. McGowan, Salter, McGowan, Swartz & Holden, Inc., Providence, R.I., trustee.

*States v. Whiting Pools, Inc.,* 462 U.S. 198, 209, 103 S.Ct. 2309, 2315–16, 76 L.Ed.2d 515 (1983).

**324**

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr.,
Bankruptcy Judge.

Heard on December 20, 1990, February 7, and February 13, 1991, on the Debtor's objection to the application of the Chapter 11 Trustee to employ an auctioneer, pursuant to 11 U.S.C. § 327(a) and Bankr.R. 2014(a).

The Debtor in this 1987 case owns real estate in Cumberland, Rhode Island, which has been partially subdivided. The platted section consists of approximately 130,000 square feet, and has been for sale by the Trustee since August, 1990. In that time, he has been unable to find a buyer at a reasonable price, and because of the increasing debt[1] to Colonial Bank and the Federal Housing Administration, the Trustee filed the instant application to hire an auctioneer to liquidate the subject property.

The Debtor objects to the application (and to the proposed liquidation) on the ground that the Trustee has not made reasonable or competent efforts to market the property, and that the "only thing that will be accomplished by allowing the Trustee's sale at public auction will be to give Colonial Bank the opportunity to ... buy the property cheap." Debtor's Objection to Trustee's Application at 2. Although she has failed to support that allegation, Mrs. Garber also argues that there is an equity-cushion sufficient to provide adequate protection for all creditors. That is simply not the case. The Debtor owes approximately $120–125,000 in pre and post-petition debt, and the value of her property, as discussed below, reveals no equity.[2]

At the initial hearing, the Debtor argued that a further subdivision of the property was feasible and, if accomplished, would command a much higher price than by selling the property in its present configuration. This case has been in Chapter 11 since March 16, 1987. Over the objection of the Trustee, whose instincts apparently are better than ours,[3] the hearing was continued for 45 days. At that time we specifically noted that if no progress was being made towards the promised subdivision, the Trustee's application would be approved, without further hearing. If significant positive steps were being achieved, however, then we would grant the Debtor an additional 45 day period in which to obtain the subdivision approval.

At the continued hearing on February 13, 1990, we heard testimony as to the feasibility of the subdivision, including evidence of the cost of necessary roads. The Debtor testified that she had an engineer's estimate for road construction at $100 per linear foot, and that she would seek to finance this construction cost through her mother. The Trustee's engineer testified to a cost of $200 per linear foot for 500 feet of roadway.

The Trustee's broker/appraiser, Peter Scotti, testified that the cost of developing the subdivision would be approximately $121,000, resulting in a *total* value of between $78,000 to $99,000,[4] discounted to present value, over the projected year and one-half development period. Even assuming a steady market (*i.e.* one with no further decline), subdivision at Scotti's projected cost would add minimal, if any, value to the property. Neighboring lot sales, according to Scotti, are between $75–$90,000. The Trustee's engineer testified that, after water table testing, approval of a septic system (ISDS) was unlikely for more than

---

1. The Debtor has not made a mortgage payment since January 1, 1989, and is presently in arrears in the amount of $92,000 to the FHA, and approximately $28,000 to Colonial.

2. Our findings and conclusions herein are inescapable, and are made only after years of overindulgence of this Debtor's persistent and unproductive delay. The instant proceeding is just another example. *See In re Saco Local Dev. Corp.*, 30 B.R. 862 (Bankr.D.Me.1983) (bankruptcy judges would be remiss if they did not take an overall view of the case including all pleadings, decisions, and related proceedings).

3. The Trustee accurately predicted the Debtor's failure to obtain further subdivision approval from the Town of Cumberland.

4. Individual lot sales would yield between $75,000 to $90,000 each, for a gross sellout of approximately $225,000, less $121,000 for development.

one lot, and that without ISDS approval, a sewer pumping station would have to be constructed to serve the parcel, at a cost of $35–$50,000.

At the conclusion of the hearing, we allowed the Debtor one week to submit an engineer's report corroborating her lay testimony as to the cost of roads. We also requested from Scotti, a comparable sales analysis with respect to the value of neighboring property.

On February 22, 1991, the Debtor submitted an "on-site study" of the subject property by her engineer, the John P. Caito Corp. That report indicates the availability of public water, but no public sewer. The engineer feels that a three-lot subdivision is feasible, but conditional upon:

1) Zoning change approval by the Town of Cumberland. The report is silent, however, as to the likelihood of obtaining such a change;

2) Rhode Island Department of Environmental Management verification of the groundwater level at more than two feet below existing grade; and,

3) Subdivision approval by the Town of Cumberland, to permit extending the existing road into the property to provide adequate frontage for the proposed lots. The cost of such an extension would approximate $36,000 (180 lineal feet of road at $200 per foot).

Scotti's analysis of nearby sales reveals that on March 24, 1988, a developer received final approval for a 10-lot subdivision abutting the Debtor's property. On that day, six of the lots were conveyed to various purchasers. No sales prices were furnished, but in March, 1990, a vacant lot in the subdivision sold for $95,000; and in January, 1991, an adjacent lot and house sold for $203,000.[5]

Last but not least, the Trustee noted, without contradiction, that on March 6, 1991, the Cumberland Town Council unanimously denied Debtor's petition to rezone the subject property. This denial, per the terms of the Debtor's own engineering report, obviates consideration of groundwater concerns, or any other subdivision efforts, the Debtor's optimistic predictions to the contrary notwithstanding. At this time they are totally unrealistic.

On March 25, 1991, the Debtor responded to the Trustee's report indicating that "because there is a comprehensive plan which is supposed to come out in the middle of April,[6] this entire matter may be muted [sic] because under the plan instead of being zoned agricultural, her land would be zoned residential which would eliminate the need for rezone [sic] change." Assuming that were the case, the Debtor would still need to go through the subdivision process, and, assuming success even on that, the plan's economic feasibility is not thereby improved. This Debtor has had four years to market the property (nearly three years since confirmation of her plan, which called for the sale of the property). To delay matters any longer, based upon the entire record and travel of this case, would be a clear abuse of discretion.

Having reviewed all (even the unsolicited) post-trial submissions, the entire record of the proceeding, including the Town of Cumberland's recent denial of the Debtor's petition to rezone the property, and the long but unproductive history of this 1987 Chapter 11 case,[7] the Trustee's Application is APPROVED.

---

5. The Court requested the Trustee to provide further details on sales of neighboring lots, either improved or unimproved, but was furnished a less-than-satisfactory report from the Trustee's broker, Peter Scotti. After repeated requests by the Court, Scotti finally filed a list of neighboring lot sales. While sales of several improved lots might support the Debtor's optimistic lot values, we cannot overlook the Town of Cumberland's denial of the Debtor's requested zone change.

6. As of the date of this decision, the referenced Town of Cumberland "comprehensive plan" is still in the draft stage, with a preliminary public hearing to be scheduled in late July, 1991, at the earliest.

7. The Debtor's amended plan of reorganization was confirmed three years ago, on June 16, 1988. It provided, among other things, for the sale of the property to a developer for $125,000, subject to subdivision approval, the proceeds of which would pay unsecured claims and administrative expenses in full. Subsequent to confir-

326

Enter Judgment consistent with this opinion.

mation, and pursuant to his purchase and sale agreement with the Debtor, the developer sought access to the property for the purpose of taking water table tests and performing other engineering work. On at least three separate occasions the Debtor or her agents denied him access to the property, even threatening bodily harm. Understandably, the buyer finally withdrew his offer to purchase the property, out of frustration with the Debtor's obstructionist tactics and behavior, and for her refusal even to

sign documents authorizing the buyer to seek subdivision approval per the terms of the agreement. The cumulative misconduct of Mrs. Garber throughout the pendency of this case places her good faith into serious question.

The Debtor initiated the subdivision process in 1989. By April, 1990, her then attorney had filed a motion to withdraw (citing lack of attorney-client trust) and Colonial Bank had filed a motion to appoint a trustee, both of which were granted.